Filed 7/28/21  Conservatorship of E.B. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| Conservatorship of the Person of E.B. | B296455 |
| H.B., as Conservator, etc., | Los Angeles County Super. Ct. No. ZE025235 |
| Petitioner and Respondent, | |
| v. | |
| E.B., | |
| Objector and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Donna L. Groman, Judge.  Affirmed.

Jean Matulis, under appointment by the Court of Appeal, for Objector and Appellant.

Ellen S. Finkelberg for Petitioner and Respondent.

_____

E.B. appeals an order appointing his sister H.B. the conservator of his person under the Lanterman-Petris-Short Act (LPS Act or the Act, Welf. & Inst. Code, § 5000 et seq.).[1] He contends the trial court prejudicially erred by failing to instruct the jury on the evaluation, weight, and effect of expert testimony. We disagree and affirm.

## FACTS AND PROCEDURAL HISTORY

On October 3, 2018, H.B. petitioned the court for reappointment as conservator of E.B. under section 5350 et seq. E.B. requested a jury trial, which began on January 28, 2019. On January 29, 2019, the jury returned a unanimous verdict finding E.B. gravely disabled due to a mental disorder.

Dr. Gary Freedman-Harvey, a contract forensic psychologist with the La Paz Gero-Psychiatric Center, testified as an expert in support of the petition. To prepare for his testimony, Dr. Freedman-Harvey reviewed E.B.'s records at La Paz and met with E.B. twice in the week preceding his testimony. The last time he had interviewed E.B. was in April 2018. He had first met E.B. in 2004.

Dr. Freedman-Harvey opined that E.B. had a diagnosis of schizophrenia chronic type—a psychosis affecting a person's sense of reality or ability to understand their environment. The hallmarks of the psychosis are paranoid or grandiose delusions. As an example, Dr. Freedman-Harvey testified that E.B. had claimed that morning that he currently earned "72 trillion dollars" from his work.

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise designated.

According to Dr. Freedman-Harvey, E.B.'s plan, if he was released from conservatorship, was to go back to his home in Beverly Hills, where he had a son, daughter, and other children. Dr. Freedman-Harvey opined E.B. was gravely disabled because he had not formulated a realistic plan for taking care of himself and the medications he took did not give him sufficient insight to function outside a secure setting without the delusions being prevalent. Dr. Freedman-Harvey opined E.B. would act upon his delusions and his delusions would keep him from fulfilling his basic needs.

H.B., the petitioner and E.B.'s sister, testified her brother's delusions started more than 30 years ago when he was about 30 years old. She said E.B. had been a wonderful big brother, but since he became ill, he needed her to take care of him. E.B. currently resided in a locked facility. She kept regular contact with him, talking with E.B. on the phone and visiting him on Saturdays or Sundays.

H.B. filed the petition for conservatorship because E.B. could not care for himself. She testified E.B. had delusions and believed he lived in Beverly Hills with Joan Rivers and children whom she had never met. He also imagined people at their table who were not there, and he "dreams up" different people. She worried E.B. would drink and use drugs if he were released from the conservatorship. At one time, E.B. had come to her porch with a prostitute and had exposed himself before H.B. returned him to the facility.

E.B. testified on his own behalf. He wanted to be released from the conservatorship and he did not agree with Dr. Freedman-Harvey's testimony. He said his home in Beverly Hills and children were not delusions. He testified he would

3

provide for his basic needs by "pass[ing] out propane" in Detroit and Chicago, and he would live with Joan Rivers, but not the actress, who he understood was dead. E.B. claimed another psychiatrist had determined he was not paranoid schizophrenic.

## DISCUSSION[2]

The LPS Act governs involuntary treatment of the mentally ill in California. (*George H., supra,* 169 Cal.App.4th at p. 159.) Under the Act, "[a] conservator of the person, of the estate, or of the person and the estate may be appointed for any person who is gravely disabled as a result of a mental disorder." (§ 5350.) "Gravely disabled" means "[a] condition in which a person, as a result of a mental disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter." (§ 5008, subd. (h)(1)(A).) However, "a person is not 'gravely disabled' if that person can survive safely without involuntary detention with the help of responsible family, friends, or others who are both willing and able to help provide for the person's basic personal needs for food, clothing, or shelter." (§ 5350, subd. (e)(1).)

E.B. contends the trial court prejudicially erred by failing to instruct the jury with CACI No. 219 regarding the evaluation,

---

[2] An LPS Act conservatorship automatically expires after one year (§ 5361), and this order has expired. The conservator argues the case is moot—"an argument which seems to be uniformly raised, and uniformly rejected, in appeals from LPS conservatorships." (*Conservatorship of George H.* (2008) 169 Cal.App.4th 157, 161, fn. 2 (*George H.*).) We agree with the many cases that hold the appeal should be heard because it raises issues that are capable of recurring but would evade review because of mootness. (*Ibid.*, citing *Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1011, fn. 5.)

4

weight, and effect of expert testimony in a civil trial.[3]  It is undisputed that, after the close of evidence and before closing arguments, the following exchange took place outside the jury's presence:

> "THE COURT:  The jury is now outside the courtroom.  I did not give the third party assistance instructions because I didn't think there was any testimony of [a] third party, that was [CACI No.] 4007.  I did not include that and I also did not repeat the evidence instructions that I already gave.  So, that would be -- let's see, [CACI No.] 202 direct and indirect evidence because I gave [the] 100 series and same for [CACI No.] 219 expert witness testimony.  I didn't repeat that one and trumped [*sic*] [CACI No.] 5000 duties of the judge and jury so we did not have to go through the electronic communications again. [¶] Any objection, Mr. Althaus [E.B.'s counsel]?

---

[3]     CACI No. 219 states:  "During the trial you heard testimony from expert witnesses.  The law allows an expert to state opinions about matters in the expert's field of expertise even if the expert has not witnessed any of the events involved in the trial. [¶] You do not have to accept an expert's opinion.  As with any other witness, it is up to you to decide whether you believe the expert's testimony and choose to use it as a basis for your decision.  You may believe all, part, or none of an expert's testimony.  In deciding whether to believe an expert's testimony, you should consider: [¶] a. The expert's training and experience; [¶] b. The facts the expert relied on; and [¶] c. The reasons for the expert's opinion."

"MR. ALTHAUS:  No, Your Honor.

"THE COURT:  Ms. Finkelberg [the petitioner's counsel]?

"MS. FINKELBERG:  No, Your Honor."

Because the parties waived reporting of the jury instructions, and because the superior court clerk was unable to locate the jury instructions proposed and given, the trial court certified a settled statement regarding the "proposed jury instructions and the actual instruction[s] given . . . to the Jury." According to the certified settled statement, the parties requested CACI No. 219, but the instruction was "not given."[4]

In a civil proceeding, the court's decision not to give a proposed instruction is usually "deemed excepted to" by operation of statute without a party making a formal objection.  (Code Civ. Proc., § 647.)  However, this statutory provision does not negate the doctrine of invited error, which estops a party from claiming

_____

[4]     According to the conservator, the court instructed the jury with CACI No. 219 before the presentation of evidence, as she contends the court's statement that it "did not repeat" and "already gave" the evidence instructions confirms.  Although we find the record ambiguous on this point, we will accept the unequivocal account in the certified settled statement that CACI No. 219 was not given.  (See Cal. Rules of Court, rule 8.137(h)(1) [trial court certifies settled statement if there are no corrections or modifications after respondent has opportunity to review and object].)  It bears emphasis that a person subject to a mental health conservatorship has a due process right to a complete and adequate record on appeal, and the better practice is to report all oral instructions given to the jury.  (*Waltz v. Zumwalt* (1985) 167 Cal.App.3d 835, 838; *People v. DeFrance* (2008) 167 Cal.App.4th 486, 494.)

6

a judgment should be reversed because of an error that the party affirmatively induced the trial court to commit. (*Ventura v. ABM Indus. Inc.* (2012) 212 Cal.App.4th 258, 271; *Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212.) "The invited error doctrine applies 'with particular force in the area of [civil] jury instructions. Whereas in criminal cases a court has strong sua sponte duties to instruct the jury on a wide variety of subjects, a court in a civil case has no parallel responsibilities.' " (*Stevens v. Owens-Corning Fiberglas Corp.* (1996) 49 Cal.App.4th 1645, 1653 (*Stevens*).)

E.B. does not contend the court's decision not to give CACI No. 219 is deemed excepted to under Code of Civil Procedure section 647. Nor could he. Because his counsel affirmatively stated he had no objection when the instruction was not given, the invited error doctrine estops E.B. from arguing he took exception to the court's stated decision not to give CACI No. 219.

Instead, E.B. contends the court must instruct the jury sua sponte on how to evaluate expert opinion testimony whenever an expert testifies in a conservatorship proceeding under the LPS Act. He argues this mandate is warranted due to the "significant liberty interests at stake," which demand "stringent due process protections in conservatorship proceedings" similar to those that apply to criminal trials. Specifically, E.B. emphasizes that trial courts are required to instruct the jury sua sponte on the weight to be given expert testimony in criminal trials, and he maintains "because civil commitment has consequences comparable to a criminal conviction," the same sua sponte duty should attach to conservatorship proceedings under the LPS Act. (Cf. Pen. Code, § 1127b.)

7

To be sure, our Supreme Court has recognized " 'involuntary commitment is incarceration against one's will regardless of whether it is called "civil" or "criminal," ' " and therefore the "due process clause of the California Constitution requires that proof beyond a reasonable doubt and a unanimous jury verdict be applied to conservatorship proceedings under the LPS Act." (*Conservatorship of Roulet* (1979) 23 Cal.3d 219, 225, 235 (*Roulet*).) However, our high court has since explained that *Roulet* was not intended to establish a blanket rule automatically extending all criminal law procedural protections to LPS conservatorships. Indeed, in matters not implicating fundamental due process, the Supreme Court has found that "the analogy between criminal proceedings and proceedings under the LPS Act is imperfect at best and that not all of the safeguards required in the former are appropriate to the latter." (*In re Conservatorship of Ben C.* (2007) 40 Cal.4th 529, 537–538 [holding "the *Anders*/*Wende* procedures are not required in appeals from LPS conservatorship proceedings," as the "conservatee is not a criminal defendant and the proceedings are civil in nature"]; see also *Conservatorship of Susan T., supra,* 8 Cal.4th at p. 1015 [holding exclusionary rule does not apply to conservatorship proceedings, finding "no similarity between the aims and objectives of the [LPS] act and those of the criminal law"].)

In *George H.*, the court considered whether the trial court had a sua sponte duty to instruct the jury that a conservatorship is unnecessary if a person is capable of accepting voluntary treatment. (*George H., supra,* 169 Cal.App.4th at pp. 161–162.) In concluding there was no such duty in a conservatorship proceeding, the reviewing court emphasized that "[a] trial court's

8

duty with regard to jury instructions is of course quite different in criminal cases than it is in civil cases." (*Id.* at p. 162.) "In criminal cases, the court must instruct on the general principles of law relevant to the issues raised by the evidence, even in the absence of a request. [Citation.] In a civil case, the parties must propose complete and comprehensive instructions in accord with their theories. If they do not, the court has no duty to instruct on its own motion." (*Ibid.*) Recognizing the gradation in the Supreme Court's application of criminal procedural safeguards to civil conservatorship proceedings, the *George H.* court held, because "LPS conservatorship proceedings are not criminal proceedings, the sua sponte duty to instruct, which applies to jury trials in criminal cases, does not apply to jury trials under [the LPS Act]." (*Id.* at pp. 164–165; but see *Conservatorship of Walker* (1987) 196 Cal.App.3d 1082, 1092, fn. 5 (*Walker*) [holding, because a "proposed conservatee is entitled to procedural due process protections similar to a criminal defendant," the "trial court had a sua sponte duty to correctly instruct on the general principles of law necessary for the jury's understanding of the case"].)[5]

---

[5] The *George H.* court disagreed with *Walker* regarding the trial court's duty to instruct the jury in a civil conservatorship proceeding. *Walker*, the *George H.* court explained, "clearly understood *Roulet* to mean that LPS conservatorships are sufficiently like criminal proceedings that criminal law procedural protections *automatically* apply." (*George H., supra,* 169 Cal.App.4th at p. 163, italics added.) That analysis, the *George H.* court determined, was inconsistent with our high court's statements on the analogy between criminal and conservatorship proceedings since *Roulet*. (*George H.,* at p. 163, citing *Conservatorship of Ben C., supra,* 40 Cal.4th at p. 538.)

9

We agree with *George H.* that the trial court in a conservatorship proceeding does not have a sua sponte duty to instruct the jury on general principles of law when a party either fails to request an instruction or, as here, affirmatively acquiesces to the court's decision not to give an instruction. Critically, although the court in a criminal proceeding has a duty to instruct the jury sua sponte on evaluating expert testimony when it is received at trial, that duty does not arise from the due process clause of the California or United States Constitution. Rather, the obligation is imposed by a Penal Code statute that has no comparable provision in the Code of Civil Procedure or the Welfare and Institutions Code. (See Pen. Code, § 1127b ["When, in any criminal trial or proceeding, the opinion of any expert witness is received in evidence, the court shall instruct the jury" on the evaluation and weight of expert testimony.]; *People v. Reeder* (1976) 65 Cal.App.3d 235, 241 ["The instruction called for by Penal Code section 1127b must be given *sua sponte* where expert testimony has been received."].) Because the failure to instruct a jury on evaluating expert testimony does not implicate fundamental due process, we conclude the procedural safeguard mandated by Penal Code section 1127b does not apply to a conservatorship proceeding under the LPS Act. (See *Conservatorship of McKeown* (1994) 25 Cal.App.4th 502, 506 [observing, "safeguards provided to criminal defendants have been applied to conservatorship hearings; however, the protections are those required by the due process clause of the California Constitution"].)

---

We agree with *George H.* and conclude the Supreme Court's precedents do not support the blanket rule adopted in *Walker*.

10

Even if E.B.'s counsel had not affirmatively acquiesced to the trial court's stated decision not to give CACI No. 219, we still would conclude the decision not to give the instruction was harmless.  Because the failure to instruct the jury on expert testimony in a criminal proceeding constitutes a nonstructural state law error, a conviction cannot be reversed unless it appears reasonably probable that, had an instruction been given, the jury would have rendered a verdict more favorable to the appellant. (See *People v. Williams* (1988) 45 Cal.3d 1268, 1320 [" ' "[T]he erroneous failure to instruct the jury regarding the weight of expert testimony is not prejudicial unless the reviewing court, upon an examination of the entire cause, determines that the jury might have rendered a different verdict had the omitted instruction been given." ' "].)  The same standard applies to our review of the decision not to give an instruction on expert testimony in a civil conservatorship proceeding.  (See *Conservatorship of K.W.* (2017) 13 Cal.App.5th 1274, 1286 [applying state law prejudice standard where error did not violate federal constitution]; *Conservatorship of Maria B.* (2013) 218 Cal.App.4th 514, 533–534 [same]; cf. *Conservatorship of Early* (1983) 35 Cal.3d 244, 255 [where erroneous instruction implicated constitutional right to have all elements of gravely disabled finding proved beyond a reasonable doubt, error was appropriately evaluated under harmless beyond a reasonable doubt standard].)

In assessing prejudicial error, "our duty is to look at the instructions as a whole, not in isolation, and we must assume jurors are able to correlate, follow, and understand the court's instructions."  (*Bay Guardian Co. v. New Times Media LLC* (2010) 187 Cal.App.4th 438, 467; *People v. Ibarra* (2007)

11

156 Cal.App.4th 1174, 1182, citing *People v. Castillo* (1997) 16 Cal.4th 1009, 1016.) Although the trial court did not give the jury specific instructions on how to evaluate expert testimony, the jury did receive the instructions set forth in CACI No. 107 on evaluating witness testimony generally. Like CACI No. 219, which informs jurors it is up to them to decide whether to believe an expert's testimony, CACI No. 107 instructed the jurors here that it was their duty "to decide whether you believe *each witness* and how important each witness's testimony is to the case." (CACI No. 107, italics added.) Additionally, similar to CACI No. 219, which instructs the jury to consider the expert's opinion but states it is not required to accept the opinion as true or correct, CACI No. 107 instructed the jury to consider the testimony of each witness and to decide how much of the testimony it believes, noting the jury could "believe all, part, or none of a witness's testimony." Finally, like the specific instructions in CACI No. 219 on evaluating the bases for the expert's opinion, CACI No. 107 instructed the jury to consider anything that reasonably tends to prove or disprove the truth or accuracy of a witness's testimony. Notwithstanding the legitimate concern that juries may accord undue weight to an expert's opinion, we conclude CACI No. 107 adequately equipped the jury in this case to evaluate Dr. Freedman-Harvey's opinion testimony, especially given the weight of other corroborating evidence the jury received. (Cf. *People v. Housley* (1992) 6 Cal.App.4th 947, 959 [holding jury must be instructed that expert testimony regarding child sexual abuse accommodation syndrome (CSAAS) is not intended and should not be used to determine whether the victim's molestation claim is true because of the demonstrated potential for misuse of CSAAS evidence].)

Dr. Freedman-Harvey testified, based on records from E.B.'s psychiatric treatment facility and two meetings with E.B. in the recent week, that E.B. suffered from "schizophrenia chronic type paranoid." He explained the psychosis's "hallmark" features include hallucinatory changes, typically hearing voices or sounds, and paranoid or grandiose delusions. Dr. Freedman-Harvey testified E.B. exhibited these delusions in recent statements about having "earning[s] of 72 trillion dollars" and a "home in Beverly Hills on Main Street" with his "son, daughter[, and] other children there." In Dr. Freedman-Harvey's opinion, without a conservatorship and supervision, E.B.'s delusions would keep him from taking care of his basic needs.

E.B.'s sister, the petitioner and proposed conservator, corroborated the factual bases for Dr. Freedman-Harvey's opinion. She testified E.B. suffered from "delusions and he indicates that he live[s] in Beverly Hills with Joan Rivers" and "has some kids that I'm not aware of." Her brother also exhibited paranoia in their interactions, including observing people at their table "who are not there."

E.B.'s testimony also corroborated Dr. Freedman-Harvey's observations. E.B. testified he did not need to be on a conservatorship because he could provide food, clothing, and shelter for himself. When asked how he would continue to provide for these basic needs if released from the conservatorship, he explained he would "go to Detroit and pass out propane" and "[p]ass out propane to Chicago." He said he had savings in "17 banks or more," as he had been "paid restitution money for working on a job." Although he planned to live with "Joan Rivers on Spring Avenue Boulevard," he explained this was not the

13

actress Joan Rivers, who had died, but his wife, who some had confused with the actress.

E.B. argues petitioner's counsel put significant emphasis on Dr. Freedman-Harvey's testimony in his closing argument and E.B. maintains this proves the decision not to give CACI No. 219 was prejudicial. Specifically, he contends counsel's statement "that 'there can be no reasonable doubt [about E.B.'s diagnosis]' . . . played into the notion that Freedman-Harvey was infallible because of his status as an expert" and the argument made it all the more necessary to instruct the jury it could " 'believe all, part, or none of an expert's testimony' as provided in CACI No. 219." On examination of the entire cause, we find this statement insufficient to establish prejudicial error.

The court instructed the jury that the lawyers' "statements and arguments are not evidence" (CACI No. 106) and, as discussed, the court also instructed the jury it could "believe all, part, or none of a witness's testimony" (CACI No. 107). Moreover, while counsel discussed the diagnosis, she also placed particular emphasis on E.B.'s own testimony, which she argued likewise "prove[d] beyond reasonable doubt" that E.B. was gravely disabled. Looking at all the instructions as a whole and the weight of the evidence supporting the jury's unanimous verdict, we cannot say it is reasonably probable that the jury would have rendered a different verdict had the court instructed it with CACI No. 219.

14

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:



LAVIN, Acting P. J.



KALRA, J.*

---

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.